Filed 11/24/21

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>JOSEPH CODINHA,<br><br>    Defendant and Appellant. | D077651<br><br>(Super. Ct. No. SCD276107) |

APPEAL from a judgment of the Superior Court of San Diego County, Joan P. Weber, Judge.  Enhancement stricken and judgment affirmed.

Garrick Byers, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Michael Pulos and Joy Utomi, Deputy Attorneys General, for Plaintiff and Respondent.

In this appeal, Joseph Codinha (Appellant) raises a number of issues as a result of rulings in four separate proceedings in the trial court:  (1) the denial of Appellant's motion to withdraw his guilty plea (Pen. Code, § 1018;

subsequent undesignated statutory references are to this code); (2) the denial of Appellant's motion to suppress evidence of drugs and drug paraphernalia (§ 1538.5); (3) the determination, based on Appellant's *Pitchess* motion (*Pitchess v. Superior Court* (1974) 11 Cal.3d 531 (*Pitchess*); see §§ 832.5, 832.7, 832.8; Evid. Code, § 1043 et seq.), that the San Diego Police Department had no records responsive to Appellant's discovery request; and (4) the sentence, which included a stay of a one-year enhancement on one of the counts (§ 667.5, subd. (b)).

With regard to Appellant's motion to withdraw his guilty plea, the basis of the various arguments he raises on appeal is the contention that, at the time of the plea, his trial attorney failed to advise him regarding whether a possible consequence of his plea included an indeterminate commitment as a sexually violent predator (SVP) at the end of any prison term. As we explain, Appellant's presentation does not meet the standard for demonstrating ineffective assistance of counsel under *Strickland v. Washington* (1984) 466 U.S. 668 (*Strickland*): Appellant did not establish *either* that his attorney's performance fell below an objective standard of reasonableness *or* that he was prejudiced by the allegedly deficient performance. (See *id*. at pp. 687-688, 691-692.) Counsel was not obligated to advise Appellant that an SVP commitment was a possible consequence of his plea; and Appellant did not present evidence that, if he had known about the potential for an SVP commitment, he would not have pled guilty.

With regard to the motion to suppress evidence, we will not reach the merits of Appellant's appellate arguments. As we explain, as part of his guilty plea, Appellant expressly gave up his right to appeal the denial of his section 1538.5 motion, and the trial court's certificate of probable cause as to the section 1538.5 motion did not affect his waiver.

With regard to the *Pitchess* motion, we have examined the sealed records from the trial court's in camera review. As we explain, in conducting its review, the trial court did not abuse its discretion.

Finally, as Appellant and the Attorney General agree, in the trial court's oral pronouncement of the sentence on count 3, the court erred by staying a section 667.5, subdivision (b) one-year enhancement. As we explain, due to a change in the law after Appellant's guilty plea and before Appellant's sentencing, at the time of sentencing Appellant was no longer subject to the one-year sentence enhancement based on a prior prison term.

Accordingly, we will strike the enhancement and affirm the judgment.

## I. STATEMENT OF THE CASE

In an amended information, the district attorney charged Appellant with four offenses which occurred on two different dates. The counts alleged, respectively: (1) felony indecent exposure (§ 314, subd. (1)); (2) misdemeanor possession of paraphernalia used for narcotics (Health & Saf. Code, § 11364); (3) felony possession of a controlled substance, i.e., methamphetamine (Health & Saf. Code, § 11377, subd. (a)); and (4) misdemeanor possession of paraphernalia used for narcotics (Health & Saf. Code, § 11364). In addition, the amended information alleged: a prison prior for violating section 314, subdivision (1) (§ 667.5, subd. (b)); five probation denial priors (two under § 314, subd. (1), and three under section 288, subd. (a)[1]); the commission of count 3 while out on bail (§ 12022.1, subd. (b)); and the requirement for registration as a sex offender (§ 290, subd. (c)) in count 3.

---

[1] The amended information alleged that the section 288, subdivision (a) convictions were serious or violent felonies for purposes of count 1 and eligibility for a three strikes life sentence (§§ 667, subds. (b)-(i), 1170.12, & 668).

3

Appellant filed a motion to suppress the drugs and drug paraphernalia evidence seized on March 28, 2018 (counts 3 & 4). (§ 1538.5.) At the close of an evidentiary hearing, the court denied the motion. Months later, Appellant filed a motion to reconsider the denial of Appellant's motion to suppress evidence (eventually refiled as a "renewed" motion to suppress evidence). After oral argument, the court denied the motion.

During the pendency of the suppression motion, Appellant filed a *Pitchess* motion directed to the records of the police officer who arrested him on March 28, 2018 (counts 3 & 4). The court conducted an in camera review of the files produced by the custodian of records of the San Diego Police Department and determined that there were no responsive records to be disclosed.

In May 2019, after the rulings on in limine motions at trial, Appellant entered a change of plea. He pled guilty to all of the charges and admitted all of the enhancement allegations.

After changing counsel, Appellant filed a motion to withdraw his plea on the basis that he "did not understand, and was misled by his [prior] attorney [regarding], the direct consequences of his plea." As relevant to the issues he raises on appeal, Appellant contended that he was not informed that there was a possibility that he could be deemed an SVP after completion of his sentence. The People filed written opposition, and the court held an evidentiary hearing at which the court received testimony from Appellant and from the attorney who represented him at the hearing on his change of plea. At the conclusion of the hearing, the court denied the motion, finding that, at the time Appellant pled guilty, "he was properly advised."

The court sentenced Appellant to eight years in prison, as follows: on count 1 (§ 314, subd. (1)), a six-year term plus an additional two years for the

out-on-bail enhancement (§ 12022.1, subd. (b)); and on count 3 (Health & Saf. Code, § 11377, subd. (a)), a four-year concurrent term.  In addition, the court: sentenced Appellant to time served on counts 2 and 4 (Health & Saf. Code, § 11364); struck the prison prior on count 1; stayed the prison prior on count 3; ordered various fines, fees, and assessments; and calculated total credits.

Appellant appealed from the judgment.  In his notice of appeal, Appellant disclosed that the appeal would include challenges to the validity of his guilty plea and the denial of his section 1538.5 motion to suppress evidence.  He also requested a certificate of probable cause, which the court granted.

## II.  STATEMENT OF FACTS

Counts 1 and 2 arose from events that occurred on March 22, 2018, and counts 3 and 4 arose from events that occurred less than a week later on March 28, 2018.  Since the case did not go to trial, we base the following factual summary on the probation report[2] and Appellant's guilty plea.

---

[2]    In summarizing the underlying facts based on the probation report, we are mindful of section 1203.05, which limits the public's access to a probation report.  In providing this report with "conditional confidentiality," the Legislature intended "to restrict access only to personal information about a defendant (such as details concerning his or her family background, medical and psychological condition, financial status, military record, and substance abuse history) not nonpersonal information, such as *the factual summary of an offense . . . .*" (*People v. Williams* (2021) 63 Cal.App.5th 990, 996, fn. 9, italics added.)  In apparent recognition of this, appellate courts refer to or even quote from a probation report's factual summary of the crimes (*id.* at pp. 996-997; *People v. Salazar-Merino* (2001) 89 Cal.App.4th 590, 594-595), and Appellant has done so in his appellate briefing.  We adhere to these limitations in the text, *post.*

A.    *March 22, 2018*

On March 22, 2018, at approximately 9:00 a.m., the San Diego Harbor Police Department responded to a telephone complaint of a white male smoking a glass pipe and masturbating in a gold Cadillac sedan (with license plates identified) parked near the intersection of Shelter Island Drive and Anchorage Lane.

When the officers arrived on Shelter Island, they noticed a gold Cadillac sedan with the identified license plates parked on Shelter Island a few blocks away from Anchorage Lane. Nearby, they saw a white male— later identified as Appellant—and informed him that someone had seen him smoking a glass pipe and masturbating. He denied the accusation, though admitted he had been arrested previously and was a registered sex offender. A records check confirmed that Appellant was a registered sex offender in compliance with his registration requirements.

Appellant consented to a search of his car. Appearing visibly nervous and sweating, Appellant said there was a glass pipe in the center console (which, Appellant explained, belonged to a friend). A search of the vehicle revealed a glass pipe with burnt black residue in the console and a pair of boxer shorts, a towel, and two tubes of hand lotion on the front passenger seat.

In a curbside lineup, the complaining party "positively identified [Appellant] as the suspect." Prior to the identification, the complaining party described the following events: He parked next to a gold Cadillac, which had backed into its parking space such that the two drivers' doors faced each other. As he stepped out of his car, he saw a man sitting in the driver's seat of the Cadillac. The man in the Cadillac was holding a glass pipe in one hand

6

and holding his erect penis in the other hand; and he began moving the hand on his penis up and down.

The harbor police arrested Appellant.

In pleading guilty to counts 1 (felony indecent exposure) and 2 (misdemeanor possession of drug paraphernalia), Appellant admitted under penalty of perjury:

> "On March 22, 2018 I willfully, lewdly:  unlawfully exposed my private parts in a public place where others were present to be annoyed, after having a previous conviction per 314(1), and having previous convictions for PC 288(a)." (*Sic*.)

> "On March 22, 2018 I unlawfully possessed a meth pipe." (*Sic*.)

B.    *March 28, 2018*

On March 28, 2018, at approximately 9:40 p.m., San Diego Police Department officers were on patrol on Pacific Highway, an area known for the use and sales of controlled substances.  Working "proactive enforcement" at a specific motel, officers saw Appellant, whom they recognized from prior contacts and arrests and knew to be a registered sex offender.  As he left a room, he and a man in the doorway engaged in "a hand-to-hand exchange of items."  When Appellant noticed the officers, the other man closed the door to the room, and Appellant walked from the room to the road.

Based on the officers' experience, they believed Appellant was at the motel to purchase a controlled substance.  On that basis, they approached him.  Appellant confirmed his identity and stated that he "had just been arrested for a previous '314.' "

Because Appellant was wearing a large hooded sweater and baggy shorts, the officers patted him down, looking for weapons.  One of the officers felt "a hard, tube[-]like object" in one of Appellant's pockets.  When asked

7

what it was, Appellant stated: " 'You know what it is.' " Believing it to be a glass pipe used for smoking narcotics, the officers confiscated the object. It was a glass pipe that contained "a thick, white crystalline material," which laboratory results later confirmed was .25 grams of methamphetamine.

The police arrested Appellant.

In pleading guilty to counts 3 (felony possession of a controlled substance) and 4 (misdemeanor possession of drug paraphernalia), Appellant admitted under penalty of perjury:

> "On March 28, 2018, I unlawfully possessed methamphetamine while being a PC 290 registrant . . . [,] after having been released on bail on earlier felony case." (*Sic*.)

> "On March 28, 2018, I unlawfully possessed a meth pipe." (*Sic*.)

## III.  DISCUSSION

In this appeal, Appellant challenges the following rulings of the trial court:  (1) the denial of Appellant's motion to withdraw his guilty plea; (2) the denial of Appellant's motion to suppress evidence of drugs and drug paraphernalia seized on March 28, 2018, outside the motel on Pacific Highway; (3) the determination that the San Diego Police Department had no records to produce, following Appellant's *Pitchess* motion; and (4) the oral pronouncement of judgment staying the section 667.5, subdivision (b) one-year sentence enhancement on count 3.  As we explain, we will strike the stayed enhancement and affirm the judgment.

A.    *Appellant's Motion to Withdraw His Guilty Plea*

Appellant contends that the trial court erred in failing to allow him to withdraw his guilty plea.  On appeal, he argues that, at the time he changed his plea to guilty, the assistance provided by his trial attorney, Michael Messina, was ineffective.  Each of the issues Appellant raises is based on the

8

legal argument that, before entering a plea on count 1 (felony indecent exposure), he was not informed, and thus did not understand, there was a possibility he could be deemed an SVP after completion of his sentence.

1. *Background*

On May 7, 2019, after rulings on the parties' in limine motions in trial, Appellant initialed and signed—and the court accepted and filed—a "Plea of Guilty/No Contest – Felony" form.[3] Neither the People nor the court made any promises or concessions; Appellant pled "to the sheet"—i.e., he pled guilty to all four counts and admitted all enhancement allegations.

Among other representations, Appellant signed or initialed that he was entering his plea "freely and voluntarily" and understood that:

- he could be sentenced to prison for a term of 25 years to life;
- this case could result in "mandatory supervision";
- he was "giv[ing] up [his] right to appeal the . . . denial of [his section] 1538.5 motion" to suppress evidence; and
- at sentencing, the court could consider his entire "prior criminal history and the entire factual background of the case."

As particularly relevant to Appellant's arguments on appeal, Appellant was *not* asked to circle, and in fact did *not* circle, that Messina "explained to [him] that other possible consequences of this plea" may occur under the "Sexually Violent Predator Law."

At the change of plea hearing, Appellant expressly confirmed that he had gone over the form with Messina and that the initials and signature on the form were Appellant's. After reviewing the constitutional rights Appellant would be giving up by pleading guilty, the court further received

---

[3] At the time of Appellant's change of plea, the San Diego County Superior Court required the use of the "SDSC CRM-012 (Rev. 2/18)" four-page form.

confirmation from Appellant that he understood that the court had "made no commitments with regard to sentencing."

Under penalty of perjury, Appellant pled guilty to each count and admitted each enhancement alleged. At the conclusion of the hearing, the court accepted Appellant's guilty pleas and admissions, expressly finding that Appellant "knowingly and voluntarily waived his rights with knowledge of the charges and the consequences of his plea."

Weeks later, Appellant changed counsel, who on Appellant's behalf filed a motion to withdraw the guilty plea. According to the motion, Appellant "did not understand, and was misled by his [prior] attorney [regarding], the direct consequences of his plea." The principal focus of Appellant's argument was that, based on what Messina told Appellant, Appellant "believed the court would give him credit for time served and probation"; i.e., Appellant understood that he "would not be sen[t] to . . . State Prison." In passing, and without argument or legal authority, Appellant also mentioned that Messina did not advise him of "the potential to be deemed a Sexually Violent Predator after his sentence is complete."

The People filed written opposition. As relevant to the issues on appeal, the People argued that the potential for being deemed an SVP at the time of completion of any sentence was not a consequence of the plea for purposes of analyzing Appellant's understanding. In addition, the People argued that, even if Appellant should have been advised of the potential SVP proceedings, he did not make the requisite showing of prejudice, because he failed to present evidence that he would not have changed his plea had counsel advised him of the potential SVP proceedings.

At the hearing, Appellant testified to what his understanding was based on what Messina had told him, and Messina testified as to what he told Appellant.

*Appellant's Testimony*

From the time Appellant retained Messina in this case through the first day of trial, Appellant told Messina that he did not want to plead guilty to the charges.

On the morning of the first day of trial—i.e., prior to the in limine motions—Messina described to Appellant a chambers conference attended by the court, the prosecutor, and Messina. Messina told Appellant that, at the conference, "he [Messina] had struck what he called a deal . . . with the judge": Appellant could "plead to the sheet" and leave sentencing to "the discretion of the judge." Although Messina indicated that there were no promises from the court, he told Appellant that "the judge would not send [him] to state prison, and that [he] would probably get time served."

Later in his testimony, Appellant more specifically explained that Messina did *not* tell him that *the court* said it would not send Appellant to prison. Appellant also confirmed that, at the hearing on the change of plea, (1) the court "very clearly on the record" stated "there were no agreements," and (2) he understood that, from the court's view, "there had been no promises made."

Significantly—and consistent with his change of plea form and his testimony at the change of plea hearing[4]—Appellant testified that, even at

_____

[4]     On the change of plea form, under penalty of perjury, Appellant initialed paragraph 7a., which begins with the statement that Appellant understands that he may receive a "maximum punishment" of "25-life." In addition, under penalty of perjury, Appellant admitted a prior section 288

11

the time Messina gave him "the impression" that the court would not send him to prison, he "*knew*" that he was facing a potential sentence of life in prison. (Italics added.)

Before making a decision regarding a change of plea, Appellant wanted to discuss Messina's proposal with his family. Accordingly, they proceeded to court, where in limine motions were heard.

As a result of the rulings on the in limine motion—in particular, the exclusion of an expert proposed by Appellant—Messina explained to Appellant that "we have no defense now" and encouraged Appellant "to take th[e] deal" they discussed prior to the hearing on the in limine motions.

The following morning, prior to appearing in court, Messina again recommended to Appellant that he "take th[e] deal." Messina advised that it was "pretty useless" to go to trial, because without an expert (based on the in limine ruling), "[w]e don't have a defense . . . we just have nothing." At the conclusion of their meeting, Messina advised Appellant that, if he did not "take th[e] deal" and was convicted, he "was going to go to prison 25-to-life."

Appellant agreed to a change of plea, after which Messina filled out the form, told him to read it, and gave it to him to initial and sign.

In particular, Messina did not advise Appellant that, because there was a potential he would be sentenced to prison "on a case that's sexual in nature," he "could potentially be deemed a sexually violent predator SVP" when he was released from prison. According to Appellant, SVP proceedings were "not a consideration" to him, because Messina told him that he was not going to prison. Consistently, Appellant testified that Messina never advised Appellant of the maximum sentence he could receive in this case. Rather, he

conviction which, the court explained to Appellant prior to the admission, "makes you eligible for a three-strike *life sentence* . . . ." (Italics added.)

12

understood from Messina that the sentencing judge "w[ould] not send [him] to state prison"; "[h]opefully," Messina told Appellant, "you'll get time served." Appellant would not have pleaded guilty if Messina had told him that, based on his record, he would be going to state prison.

Despite what Messina may or may not have told Appellant, as they discussed whether Appellant would change his plea, Appellant "knew" that this "was filed as a 25-to-life case, on each count." Consistently, based on the language in the change of plea form, as he initialed and signed the form, Appellant "knew" that he would be facing a potential sentence of "life in prison." Appellant further understood that "there were no deals from the Court on sentencing" at the time he pled guilty. Finally, in response to questioning from the court, Appellant expressly acknowledged: In the last 20 years, no sentencing judge had granted him probation, instead sentencing him to prison, *based on his prior record*; and his prior conviction for violating section 288 (lewd or lascivious acts) "is a conviction for life," with the resulting strike remaining on his record forever.

*Messina's Testimony*[5]

In more than 39 years as a criminal defense attorney, Messina had tried more than 40 cases before juries in state and federal court, including eight SVP cases. Although Messina was "fully prepared to go to trial," for at least two reasons, he believed Appellant's case was not one that should go to trial.

First, on April 19, 2019, a little more than two weeks prior to the in limine motions, Appellant told Messina that, on March 22, 2018, "he

---

[5] By Appellant's presentation, both in writing and on the witness stand, the trial court ruled that Appellant had waived the attorney-client privilege.

[Appellant] committed the crime"; i.e., Appellant confessed that "he [Appellant] went to Shelter Island that day to masturbate." Thus, Messina explained to Appellant that he (Messina) could not put Appellant on the stand to testify in his defense; and without Appellant's testimony, "all we have is the impeachment" of the complaining witness at Shelter Island for the March 22 incident and the arresting officer at the motel for the March 28 incident.

Messina explained to Appellant that "[t]his is not a good case for trial"; but, if the case is assigned to "a good judge, who I think will be fair at sentencing, we should consider a plea." Later, when the case was assigned to a trial department, Messina told Appellant that "we have a good judge. Judge Weber is fair. . . . I think she would be fair on this particular case. And I think she would be good at sentencing. And we'd have the opportunity to limit [the] amount of time in custody."

Messina also reminded Appellant that the last time he was sentenced for a violation of section 314, even though the trial court struck the priors, it nonetheless sentenced him to seven years in prison—which "was a very good result." Messina further advised Appellant that, if he goes to trial with only impeachment evidence as a defense, given the prior sentence, Messina was "worried" that the court would sentence Appellant to more than seven years this time.

Second, based on the court's May 6, 2019 rulings on in limine motions, Messina explained to Appellant "the difference between pleading now and admitting guilt and asking for the judge to strike strikes, versus going to trial *with no defense* and facing life in prison." (Italics added.)

Messina was adamant: At no time did he tell Appellant that Judge Weber *either* would not send him to prison *or* would grant him

14

probation. To the contrary, Messina confirmed that, not only did he tell Appellant that the court had made no promises, he expressly told Appellant that he is "probably going to have to do some state prison time."

Messina testified that he went through each line of the change of plea form, explaining to Appellant what each line meant. That said, line 7f. of the form refers to "other possible consequences of th[e] plea"; beneath line 7f., item (14) identifies "Sexually Violent Predator Law," which is not circled; and Messina did not recall discussing with Appellant anything regarding the "Sexually Violent Predator Law" when explaining to Appellant "other possible consequences of th[e] plea." According to Messina, he did not raise the issue, because "[section ]314 is not considered a sexually violent offense, pursuant to [section ]6500 of the Welfare & Institutions Code," which contains "the law on sexually violent predators."

In arguing the merits of the motion, the focus was on what Messina said or did not say regarding the likelihood of Appellant prevailing at trial and the likelihood of a prison sentence in the event Appellant changed his plea to guilty. During argument, neither the attorneys nor the court mentioned the issue of Messina's failure to discuss whether possible consequences of the plea included the SVP law.

The court denied Appellant's motion, ruling that Appellant did not meet his burden. The court concluded that Messina properly advised Appellant as to both the potential outcome of a trial and the possible sentence following a guilty plea, expressly finding that, with 10 prior convictions, Appellant was a "sophisticated" defendant who was experiencing "buyer's remorse."

15

2.  *Analysis*

On appeal, Appellant does not challenge the trial court's conclusion that Messina properly advised Appellant as to both the potential outcome at trial and the possible sentence following a guilty plea.  Appellant's argument is directed solely to Messina's "oblig[ation] to, at a minimum, inform [Appellant] that, when his prison sentence is completed, there could be SVP consequences that could result in a lifetime commitment."  Appellant characterizes this failure as ineffective assistance of counsel.  In passing, Appellant also suggests that, by failing to refer to Messina's failure to advise Appellant regarding potential SVP consequences from a guilty plea, the trial court abused its discretion in denying Appellant's motion.

As we explain, Appellant did not meet his burden of establishing that Messina had a duty to advise him regarding potential SVP consequences of a change of plea.[6]  Thus, Appellant did not meet his burden of establishing either that Messina's assistance was ineffective or that the court abused its discretion in failing to make findings regarding any potential SVP consequences resulting from Appellant's guilty plea.

a.  *Ineffective Assistance of Counsel*

"Under both the Sixth Amendment to the United States Constitution and article I, section 15, of the California Constitution, a criminal defendant has the right to the assistance of counsel."  (*People v. Ledesma* (1987) 43 Cal.3d 171, 215, citing *Strickland*, *supra*, 466 U.S. at pp. 684-685.)  This right entitles the defendant "not to some bare assistance but rather to *effective* assistance."  (*Ledesma*, at p. 215; accord, *Strickland*, at p. 686.)

---

[6]    We will assume without deciding that Appellant's guilty plea will result in potential SVP consequences to Appellant.

16

"In order to establish a claim for ineffective assistance of counsel, a defendant must show that his or her counsel's performance was deficient and that the defendant suffered prejudice as a result of such deficient performance." (*People v. Mickel* (2016) 2 Cal.5th 181, 198 (*Mickel*), citing *Strickland, supra,* 466 U.S. at pp. 687-692; accord, *People v. Patterson* (2017) 2 Cal.5th 885, 901 (*Patterson*).) To establish deficient performance, the defendant has the burden of showing that counsel's performance " 'fell below an objective standard of reasonableness . . . under prevailing professional norms.' " (*Mickel*, at p. 198; accord, *Patterson*, at p. 900.) To establish prejudice, the defendant has the burden of showing " 'that a reasonable probability exists that, but for counsel's incompetence, he would not have pled guilty.' " (*Patterson*, at p. 901; accord, *Mickel*, at p. 198.) In this context, a " 'reasonable probability' " is a " 'probability sufficient to undermine confidence in the outcome.' " (*People v. Superior Court (Ghilotti)* (2002) 27 Cal.4th 888, 918, quoting *Strickland, supra,* 466 U.S. at p. 694.)

Appellant acknowledges that there is no California authority on the issue he presents—namely, whether, in advising the defendant on whether to plead guilty to a charge, defense counsel has an obligation to inform the defendant that, when the potential prison sentence is completed, there could be SVP consequences that could result in a lifetime commitment. Instead, he analogizes potential SVP consequences to potential immigration consequences, where under federal and state law, defense counsel must provide such advice to the defendant. As we explain, the analogy is inapt.

In *Padilla v. Kentucky* (2010) 559 U.S. 356 (*Padilla*), the Supreme Court held that the Sixth Amendment requires criminal defense counsel to

properly advise their noncitizen clients regarding the potential immigration consequences of their criminal cases.[7] (*Id.* at pp. 367-368.)

In 2015, by codifying *Padilla*'s requirement that defense counsel advise criminal defendants about adverse immigration consequences, the California Legislature made this "an independent statutory duty that does not require finding a violation of the Sixth Amendment." (*People v. Lopez* (2021) 66 Cal.App.5th 561, 575 (*Lopez*), citing §§ 1016.2, 1016.3 [§ 1018 motion to withdraw plea].[8]) Section 1016.3, subdivision (a) requires criminal defense counsel to "provide accurate and affirmative advice about the immigration consequences of a proposed disposition, and when consistent with the goals of and with the informed consent of the defendant, and consistent with professional standards, defend against those consequences." Section 1016.3, subdivision (b) goes further than *Padilla* by also requiring prosecutors, when developing and considering plea offers, to "consider the avoidance of adverse

---

[7] Where the potential deportation consequences of a particular plea "are unclear or uncertain" or where "the law is not succinct and straightforward," then counsel need only advise the client that the "pending criminal charges may carry a risk of adverse immigration consequences"; however, where the potential immigration consequences are clear, then counsel must provide the client with accurate advice. (*Padilla, supra,* 559 U.S. at p. 369.)

[8] Subdivisions (a)-(c) of section 1016.2 cite, summarize, and quote from *Padilla, supra,* 559 U.S. 356. Subdivision (h) expressly states the Legislature's intent to codify *Padilla* and "to encourage the growth of such case law in furtherance of justice." Subdivision (e) explains the reasoning behind this legislative intent: "Defendants who are misadvised or not advised at all of the immigration consequences of criminal charges often suffer irreparable damage to their current or potential lawful immigration status, resulting in penalties such as mandatory detention, deportation, and permanent separation from close family. In some cases, these consequences could have been avoided had counsel provided informed advice and attempted to defend against such consequences."

immigration consequences in the plea negotiation process as one factor in an effort to reach a just resolution."[9]

There are no similar statutes or indications of a legislative intent that require defense counsel to advise their clients of the potential SVP consequences of the clients' guilty pleas.

Following *Padilla*, *supra*, 559 U.S. 356, and California statutory law (e.g., §§ 1016.2, 1016.3, 1016.5), our Supreme Court decided *Patterson*, *supra*, 2 Cal.5th 885, a case involving undisclosed potential immigration consequences to a noncitizen defendant who pleaded guilty to drug possession charges. (*Id*. at p. 889.) In *Patterson*, our Supreme Court ruled that, for purposes of seeking to withdraw a guilty plea under section 1018, a defendant may rely on defense counsel's failure to provide advice regarding collateral immigration consequences of a plea, even where the court has no such duty. (*Patterson*, at p. 897.)

In the present appeal, the Attorney General argues that the Sixth Amendment only requires that the defendant be advised of the *direct* potential consequences of an anticipated plea, whereas the possibility of an SVP commitment is, at best, a *collateral* consequence since it does not

---

9       Section 1016.3, which deals with the duties of *defense counsel*, is in addition to section 1016.5, which since 1978 has required *trial courts* to ensure that defendants are advised of immigration consequences before accepting a guilty plea. In enacting section 1016.5, the Legislature intended "to promote fairness to such accused individuals by requiring in such cases that acceptance of a guilty plea or plea of nolo contendere be preceded by an appropriate warning of the special consequences for such a defendant which may result from the plea." (§ 1016.5, subd. (d).) Receipt of this statutory warning, however, is not a bar to a noncitizen defendant seeking to withdraw a guilty plea on the basis of the lack of advice of the adverse immigration consequences of the plea. (*Patterson*, *supra*, 2 Cal.5th at p. 889.)

"inexorably follow from the defendant's conviction of the offense involved in his plea." (Citing *People v. Moore* (1998) 69 Cal.App.4th 626, 630 (*Moore*) [§ 1018 motion to withdraw plea].) *Moore* is distinguishable in that it deals with *the court's*, not *counsel's*, obligation to advise the defendant of the potential SVP consequences of the defendant's guilty plea. (*Moore*, at p. 628; see *Patterson*, *supra*, 2 Cal.5th at p. 897 ["the focus of a section 1018 inquiry is not what the trial court told the defendant; it is, rather, what the defendant knew when entering the plea"].) Nonetheless, *Moore* provides insight and guidance as to the distinction between direct, as opposed to collateral, consequences of a plea.

In *Moore*, the appellate court held that, in accepting the defendant's guilty plea, the trial court was *not* required to advise the defendant as to a potential SVP commitment. (*Moore*, *supra*, 69 Cal.App.4th at p. 631.) The basis of this holding is that a trial court is required to advise defendants only of the " 'primary and direct consequences of a defendant's impending conviction as contrasted with secondary, indirect or collateral consequences' " and "generally extends only to 'penal' consequences." (*Id.* at p. 630.) The court explained:

> "A consequence is deemed to be 'direct' i[f] i[t] has 'a definite, immediate and largely automatic effect on the range of the defendant's punishment.' [Citation.] Such direct consequences include: the permissible range of punishment provided by statute [citation]; imposition of a restitution fine and restitution to the victim [citation]; probation ineligibility [citation]; the maximum parole period following completion of the prison term [citation]; registration requirements [citation]; and revocation or suspension of the driving privilege [citation].
>
> "A consequence is considered 'collateral' if it 'does not "inexorably follow" from a conviction of the offense involved in the plea.' [Citation.] Collateral consequences include: the possibility of enhanced punishment in the event of a

20

future conviction [citation]; the possibility of probation revocation in another case [citation]; and limitations on the ability to earn conduct and work credits while in prison [citation]." (*Moore*, at p. 630.)

The *Moore* court assumed without deciding that, by virtue of his plea and admissions, the defendant in that case would be referred to an initial screening under the SVP Act (Welf. & Inst. Code, § 6600 et seq.) before his release from prison. (*Moore*, at p. 632.) Nonetheless, "this screening would not necessarily lead to a finding that [the defendant] was a[n SVP] under the SVP Act. Any such determination would require additional steps and would depend on additional findings which would not be controlled by [the defendant's] plea and admissions . . . ." (*Moore*, at p. 632.)

Likewise, in the present appeal, where we have made the same assumption—namely, that Appellant's guilty plea will result in potential SVP consequences (see fn. 6, *ante*)—we also conclude that any commitment "would require additional steps and would depend on additional findings which would not be controlled by [Appellant's] plea and admissions" in this case.[10]

_____

[10]    In his opening brief, Appellant presents more than four pages describing certain procedures and standards under the SVP Act which must be met before someone like Appellant may be committed. In reply, Appellant describes the risk of adverse SVP consequences in this case as "palpable but . . . also 'unclear or uncertain.' "

In the respondent's brief, the Attorney General argues that only "after a confluence of *all* the[ following] factors and findings would [A]ppellant be committed as an SVP": "*If* the Department of Corrections refers [A]ppellant to the Board of Parole Hearings for an initial screening and [A]ppellant is found to likely be an SVP, the Board of Parole Hearings will refer him to the Department of State Hospitals for a full evaluation by two psychologists. (*Reilly v. Superior Court* (2013) 57 Cal.4th 641, 646-647.) *If* the psychologists agree that [A]ppellant meets the criteria for SVP commitment, a petition for commitment is filed in the superior court, and a probable cause hearing is scheduled. (*Id*. at p. 647.) *If* a court determines probable cause exists, it sets

(*Moore*, *supra*, 69 Cal.App.4th at p. 632.) Thus, as in *Moore*, an SVP commitment "will not be an 'immediate' or 'inexorable' result of [Appellant's] plea and admissions in this case." (*Ibid.*)[11]

With that background, we now consider whether Messina's failure to advise Appellant of the potential SVP consequences of his guilty plea was deficient—i.e., whether Messina's performance fell below an objective standard of reasonableness under "prevailing professional norms." (*Mickel*, *supra*, 2 Cal.5th at p. 198; *Patterson*, *supra*, 2 Cal.5th at p. 900; see *Strickland*, *supra*, 466 U.S. at pp. 687-692.) We begin with the understanding that neither the appellate briefing nor our independent research disclosed any reported opinions that might establish "prevailing professional norms" on this issue; and neither side presented any expert testimony at the hearing. This is entirely *unlike* defense counsel's obligation to advise a defendant of potential immigration consequences of a guilty plea, where there is United States Supreme Court precedent, California Supreme Court authority, and California statutory law setting forth minimum

---

the matter for trial. 'This trial contains a number of procedural safeguards commonly associated with criminal trials, including the alleged SVP's right to a jury trial [citation], to assistance of counsel [citation], and to a unanimous jury finding that he or she is an SVP beyond a reasonable doubt before he or she may be committed. [Citation.])' (*Reilly v. Superior Court*, *supra*, 57 Cal.4th at p. 648.)"

11    In *People v. Ibanez* (1999) 76 Cal.App.4th 537, Division Two of this court followed *Moore*, *supra*, 69 Cal.App.4th 626, in reversing the grant of the defendant's petition for writ of error *coram nobis*. In *Ibanez*, the appellate court ruled that the law does not require the trial court to advise a criminal defendant of the potential SVP consequences of a plea, because "civil commitment under the SVP [Act ]is a collateral consequence rather than a direct penal consequence." (*Id*. at p. 546.)

professional standards. (*Padilla*, *supra*, 559 U.S. at pp. 367-368; *Patterson*, *supra*, 2 Cal.5th at p. 897; §§ 1016.2, 1016.3.)

We find further guidance from *Padilla*, *supra*, 559 U.S. 356. Unlike an SVP commitment in California, "as a matter of federal law, deportation is an integral part—indeed, sometimes the most important part—of the penalty that may be imposed on noncitizen defendants who plead guilty to specified crimes." (*Id*. at p. 364, fn. omitted.) In this regard, the Court expressly recognized that " ' "[p]reserving the client's right to remain in the United States may be more important to the [noncitizen defendant] than any potential jail sentence" ' " and that " 'preserving the possibility of' discretionary relief from deportation . . . 'would have been one of the principal benefits sought by defendants deciding whether to accept a plea offer or instead to proceed to trial.' " (*Id*. at p. 368, quoting from *INS v. St. Cyr* (2001) 533 U.S. 289, 322, 323.) Deportation of a noncitizen criminal defendant, although civil in nature, is "enmeshed" in and "intimately related to the criminal process," since it is "nearly an automatic result" for many offenses. (*Padilla*, at pp. 365-366.)

In ruling that defense counsel's performance is deficient if counsel fails to properly advise a noncitizen defendant client regarding the potential immigration consequences of a guilty plea (*Padilla*, *supra*, 559 U.S. at pp. 367-368), the Court expressly warned that "we must be especially careful about recognizing new grounds for attacking the validity of guilty pleas" (*id*. at p. 372). To this end, Justice Alito emphasized that *Padilla* involved "removal," compared to the following " 'seriou[s]' " consequences of a guilty plea that do not affect defense counsel's duty to the defendant: "*civil commitment*, civil forfeiture, the loss of the right to vote, disqualification from public benefits, ineligibility to possess firearms, dishonorable discharge from

the Armed Forces, and loss of business or professional licenses." (*Id*. at p. 376 [conc. opn. of Alito, J.], italics added.) In addition, while not affecting counsel's duty to the client, "[a] criminal conviction may also severely damage a defendant's reputation and thus impair the defendant's ability to obtain future employment or business opportunities." (*Ibid*.) The point is: Failure of defense counsel to advise the defendant of even the serious consequences associated with civil commitment proceedings is not a basis on which to set aside a guilty plea.

For the foregoing reasons, defense counsel's duty to advise a noncitizen defendant of the potential immigration consequences of a guilty plea does not support recognition of a new and different basis on which to attack an otherwise valid guilty plea—namely, an attorney's duty to advise all criminal defense clients of the potential SVP consequences of a guilty plea. The potential for SVP consequences—i.e., *civil commitment*—from a defendant's guilty plea is " 'secondary, indirect or collateral,' " not " 'primary and direct.' " (*Moore*, *supra*, 69 Cal.App.4th at p. 630.) Unlike the potential immigration consequences for a noncitizen defendant convicted of certain crimes, potential SVP consequences are neither "enmeshed" in and "intimately related to the criminal process" nor "nearly an automatic result" for many offenses. (*Padilla*, *supra*, 559 U.S. at pp. 365-366.)

In short, we are not persuaded by Appellant's analogy to potential immigration consequences for noncitizen defendants; and Appellant does not present any other authority in support of his position. Accordingly, we conclude that Appellant did not meet his burden of establishing that Messina had a duty or obligation to advise Appellant as to the potential SVP consequences of his guilty plea and admissions. Without such a duty,

24

Messina's performance was not deficient—i.e., did not fall below an objective standard of reasonableness under prevailing professional standards.

Moreover, even if we were to assume Messina performed deficiently, Appellant did not demonstrate the requisite showing of prejudice—i.e., Appellant did not establish " 'a reasonable probability' " that, but for Messina's performance, " '[Appellant] would not have pled guilty.' " (*Patterson*, *supra*, 2 Cal.5th at p. 901; *Mickel*, *supra*, 2 Cal.5th at p. 198; see *Strickland*, *supra*, 466 U.S. at pp. 687-692.) Very simply, Appellant presented no evidence that, had he been advised of the SVP consequences of a guilty plea and admissions, he would not have changed his plea. Indeed, Appellant acknowledges that the record lacks such evidence; and we reject Appellant's suggestion that the evidence of Appellant "having sought to withdraw his [guilty] plea when he realized he might not get probation" is evidence of a reasonable probability that, had Messina advised him of the potential SVP consequences of his plea, he would not have pled guilty.

Having failed to establish *both* a deficient performance by Messina *and* prejudice as a result of Messina's performance (if we were to assume Messina's performance fell below an objective standard of reasonableness), Appellant did not meet his burden of establishing that Messina's assistance was ineffective under *Strickland*, *supra*, 466 U.S. 668; *Patterson*, *supra*, 2 Cal.5th 885; and *Mickel*, *supra*, 2 Cal.5th 181.

      b.    *Section 1018*

Appellant suggests that the trial court erred in not mentioning, and thus expressly ruling on, Appellant's claim that Messina failed to advise him regarding the potential SVP consequences of a guilty plea and admissions. We disagree.

"On application of the defendant at any time before judgment . . . the court may . . . , for a good cause shown, permit the plea of guilty to be withdrawn and a plea of not guilty substituted. . . . This section shall be liberally construed to effect these objects and to promote justice." (§ 1018.) In the trial court, to prevail on a motion to withdraw a guilty plea, a defendant must establish good cause by clear and convincing evidence. (*People v. Fairbank* (1997) 16 Cal.4th 1223, 1254.) " 'Mistake, ignorance or any other factor overcoming the exercise of free judgment is good cause for withdrawal of a guilty plea' under section 1018." (*Patterson*, *supra*, 2 Cal.5th at p. 894.)

We review the trial court's decision whether to permit a defendant to withdraw a guilty plea under section 1018 for an abuse of discretion; and, as potentially applicable here, the court abuses its discretion if it bases its decision on an error of law. (*Patterson*, *supra*, 2 Cal.5th at p. 894; *Lopez*, *supra*, 66 Cal.App.5th at p. 574.) Although Appellant embraces this standard in his opening brief, in his reply brief, he contends the proper standard is independent review. In presenting this new argument, he relies on *People v. Vivar* (2021) 11 Cal.5th 510 (*Vivar*), an opinion filed by our Supreme Court after Appellant filed his opening brief in this appeal. Before reaching the merits of Appellant's argument, we first explain why *Vivar* is inapplicable here.

*Vivar* discusses only the standard that should be applied to appellate review of trial court *rulings of prejudice under section 1473.7, subdivision (a)(1).* (*Vivar*, *supra*, 11 Cal.5th at pp. 523-528.) Notably, section 1473.7 does not involve a motion to withdrawal a guilty plea by a party in custody (like § 1018). Section 1473.7 provides for a motion to vacate a conviction by a person no longer in custody; and subdivision (a)(1) is limited

26

to the situation where "[t]he conviction or sentence is legally invalid due to prejudicial error damaging the moving party's ability to meaningfully understand, defend against, or knowingly accept *the actual or potential adverse immigration consequences* of a plea of guilty or nolo contendere." (Italics added.) Here, by contrast, Appellant is in custody, seeks to withdraw his guilty plea under section 1018 (which has different standards than vacating a judgment under § 1473.7, subd. (a)(1)), and has no concern regarding adverse immigration consequences of his guilty plea.

Indeed, even though *Vivar* does require application of an independent standard of review to trial court rulings of prejudice, the *Vivar* court expressly limited its application of independent review to appeals from section 1473.7 proceedings. "So our embrace of independent review in this context is a product of multiple factors with special relevance here: the history of section 1473.7, the interests at stake in a section 1473.7 motion, the type of evidence on which a section 1473.7 ruling is likely to be based, and the relative competence of trial courts and appellate courts to assess that evidence." (*Vivar, supra*, 11 Cal.5th at p. 527.)[12]

In addition, with regard to the type of evidence on which a section 1473.7 ruling is likely to be based, *Vivar* addressed only appellate review of an entirely written record: "Where, as here, the facts derive entirely from written declarations and other documents . . . there is no reason

---

[12] In passing, Appellant alternatively suggests that we apply a de novo standard of review to the denial of Appellant's section 1018 motion, because "the constitutional right to effective assistance of counsel is at stake." (Citing *People v. Ogunmowo* (2018) 23 Cal.App.5th 67, 76.) We decline to follow *Ogunmowo* because, like *Vivar, supra*, 11 Cal.5th 510, it involved the application of section 1473.7, subdivision (a)(1), not section 1018. (*Ogunmowo*, at p. 69.)

to conclude the trial court has . . . special purchase on the question at issue; as a practical matter, '[t]he trial court and this court are in the same position in interpreting written declarations' when reviewing a cold record in a section 1473.7 proceeding." (*Vivar*, *supra*, 11 Cal.5th at pp. 527-528.) Here, by contrast, the trial court heard live, often conflicting, testimony from Appellant and Messina.

We thus proceed to review the trial court's ruling for an abuse of discretion. (*Patterson*, *supra*, 2 Cal.5th at p. 894; *Lopez*, *supra*, 66 Cal.App.5th at p. 574.)

First, in response to Appellant's suggestion that a "trial court abuses its discretion when it 'fails to consider a relevant factor that deserves significant weight' " (quoting *In re White* (2020) 9 Cal.5th 455, 470), there is no indication that the trial court here failed to consider whether Messina advised Appellant regarding the potential SVP consequences of a change in his plea. Moreover, this failure was not a factor that deserved "significant weight" in the section 1018 proceedings. As described *ante*, the "good cause" for the requested relief in the motion was based on Appellant's alleged misunderstanding as to the likelihood of receiving a prison sentence. According to Appellant, based on what Messina told him, he would be sentenced to time served. In the nine pages that comprise Appellant's motion to withdraw his guilty plea, Appellant mentioned the possibility of an SVP commitment only three times and presented no evidence or legal authority related to this issue.[13] During argument at the close of the evidentiary

---

[13]    In an unsworn statement signed by Appellant, Appellant argued: "I was not informed that there was a possibility I could be deemed a Sexually Violent Predator after my sentence was complete." In an unsworn statement signed by Appellant's attorney, counsel argued: "After entering his plea to

hearing, Appellant's attorney did not once mention the potential for SVP consequences from the guilty plea.  Counsel's entire presentation, including answering questions from the court, focused solely on what Appellant understood regarding the potential of being sentenced to prison.[14]  Only in this appeal, for the first time, has "significant weight" been given to potential SVP consequences.

In any event, Appellant does not present, and our independent research has not disclosed, any authority that requires the trial court to make findings as to each argument raised in the pleadings.  Further, Appellant did not request such findings as to any issue, let alone one that was not emphasized during the proceedings.

For these reasons, Appellant did not meet his burden of establishing that the trial court abused its discretion in denying his section 1018 motion without making express findings on Messina's failure to advise Appellant as to potential SVP consequences from his guilty plea.

B.    *Appellant's Motion to Suppress Drug and Drug Paraphernalia Evidence*

Appellant argues that the trial court erred in denying his section 1538.5 motion to suppress the drug and drug paraphernalia evidence seized on March 28, 2018 (counts 3 & 4).  We will not reach the merits of Appellant's argument, however, because as part of the proceedings at which

---

the court, Mr. Codinha was facing over 25 years to Life in State Prison.  Not to mention the potential for an SVP commitment after the service of his time."  In a further unsworn statement, Appellant's attorney argued: "Further, [Appellant] was not advised of his probation ineligibility or the potential to be deemed a Sexually Violent Predator after his sentence is complete."

14    Nor did the prosecutor, during her argument, mention Messina's failure to advise Appellant regarding potential SVP consequences.

29

he pled guilty, Appellant expressly waived his right to appeal from the denial of his section 1538.5 motion.

    1.    *Background*

Appellant filed a motion to suppress the evidence of drugs and drug paraphernalia that was seized on March 28, 2018, outside the motel on Pacific Highway. Following an evidentiary hearing at which the arresting officer testified, the court denied the motion in October 2018. Appellant then filed, and in March 2019 the court denied, a motion for reconsideration (which, by the time of the hearing, Appellant refiled as a "renewed motion to suppress evidence" (capitalization and bolding omitted)).

Months later, during the morning of the second day of trial, Appellant pled guilty and admitted all enhancement allegations. In initialing and signing the change of plea form under penalty of perjury, Appellant expressly agreed to "give up [his] right to appeal the . . . denial of [his section ]1538.5 motion" (the Waiver). Before Appellant initialed and signed the form, Messina explained to Appellant what the Waiver meant, and Appellant does not contend that he did not understand the Waiver. Elsewhere on the form, Messina stated that he read and explained "the entire contents of this plea form" to Appellant.

Prior to accepting Appellant's change of plea, the court requested and received Appellant's confirmation under penalty of perjury that, before signing and initialing the form, he had the opportunity to go over it with Messina; and, in response to a direct question from the court, Appellant testified that he had no questions regarding the form. At the conclusion of the hearing, the court accepted Appellant's guilty plea and admissions after

expressly finding that Appellant "knowingly and voluntarily waived his rights."[15]

Appellant appealed from the judgment, and in his notice he disclosed that the appeal would include challenges to the validity of his guilty plea and the denial of his section 1538.5 motion to suppress evidence. He further requested a certificate of probable cause, which the court granted.

Significantly, in his request, Appellant did not mention either the Waiver or his intent to contest the validity of the Waiver (either directly in the appeal or indirectly by requesting a certificate of probable cause for appellate review of the ruling denying suppression of the evidence). Appellant's request for a certificate of probable cause provides in full:

> "[Appellant] entered an open plea to the court on advice of prior counsel where his exposure was 50 years to Life in State Prison. [Appellant] was not properly advised of his rights and consequences prior to entering that plea and is alleging ineffective assistance of counsel. A full hearing was held regarding a motion to withdraw that plea and it was denied. [Appellant] would like to appeal that ruling *as well as the 1538.5.*" (Italics added.)

Not surprisingly, therefore, the court's order also did not mention the Waiver:

> "A judgment of conviction upon a plea of guilty or nolo contendere, or an admission of violation of probation, was entered in the above-entitled case on 05/07/2019 and the defendant was sentenced on 03/13/2020. The defendant submitted a Notice of Appeal and Request for Certificate of Probable Cause on 06/19/2020. The court finds defendant has shown reasonable constitutional, jurisdictional, or

---

15 The court's written findings provide in part: "[Appellant] understands and voluntarily and intelligently waives [his] constitutional rights; [Appellant's] plea and admissions are freely and voluntarily made; [Appellant] understands the nature of the charges and the consequences of the plea and admissions . . . ."

other grounds for appeal relating to the legality of the proceedings and certifies that there is probable cause for an appeal from the referenced judgment."

2.    *Analysis*

The Attorney General argues that Appellant's challenge to the order denying the motion to suppress evidence is not cognizable on appeal, because Appellant waived his right to appeal the ruling in the Waiver. Anticipating this argument, in his opening brief Appellant attempts to justify his appeal despite the Waiver on the following two grounds: (1) Appellant received no consideration for the Waiver; and (2) by issuing the certificate of probable cause, the trial court determined Appellant was entitled to challenge denial of the suppression motion regardless of the Waiver.

As we explain, the Attorney General has the better view. As a general rule, obtaining a certificate of probable cause does not make cognizable issues that the defendant waived as part of a guilty plea. More specifically, in this case, by failing to disclose the express Waiver to the trial court in his request for a certificate of probable cause, Appellant may not argue on appeal that the Waiver was ineffective or unenforceable or that the generic certificate of probable cause issued by the trial court otherwise affected the Waiver.

Absent specified exceptions, a criminal defendant may appeal "from a final judgment of conviction." (§ 1237, subd. (a); accord, *People v. Stamps* (2020) 9 Cal.5th 685, 694 (*Stamps*).) One such exception to this right to appeal from a final judgment is: Where (as here) the judgment results from a guilty plea, section 1237.5, subdivisions (a) and (b) provide, respectively, that no appeal may be taken unless "[t]he defendant has filed with the trial court a written statement, executed under oath or penalty of perjury showing reasonable constitutional, jurisdictional, or other grounds going to the legality of the proceedings," and the court "has executed and filed a certificate

of probable cause for such appeal with the clerk of the court." (*Stamps*, at p. 694; see Cal. Rules of Court, rule 8.304(b) (rule 8.304(b)).)

Section 1237.5's requirement for a certificate of probable cause "functions to discourage frivolous appeals following a guilty . . . plea" and "promotes judicial economy by screening out baseless postplea appeals before time and money are spent on record preparation, briefing and appellate review." (*Stamps*, *supra*, 9 Cal.5th at p. 694.) Because a section 1237.5 certificate of probable cause only " 'relates to the procedure in perfecting an appeal from a judgment based on a plea of guilty, and *not to the grounds upon which such an appeal may be taken*,' . . . [the] filing [of] a certificate cannot expand the scope of review to include a noncognizable issue." (*People v. Hoffard* (1995) 10 Cal.4th 1170, 1178, italics added.)

Rule 8.304(b) provides well-recognized exceptions to the certification requirement. In particular, rule 8.304(b)(4)(A) permits an appeal without a certificate of probable cause where (as here) the appeal is based on " '[t]he denial of a motion to suppress evidence under . . . section 1538.5.' " (See *People v. Mashburn* (2013) 222 Cal.App.4th 937, 941 (*Mashburn*).) Likewise, section 1538.5, subdivision (m) provides that a defendant may appeal the validity of a search or seizure following a conviction based on a plea of guilty.

Thus, *without more* Appellant would have been entitled to appellate review of the order denying his section 1538.5 motion. (Rule 8.304(b)(4)(A); § 1538.5, subd. (m).) In the present case, however, there is *more*: By the Waiver, Appellant expressly gave up his right to appellate review of that order.

We begin with the understanding that " 'it is well settled that a plea bargain may include a waiver of the right to appeal.' " (*Mashburn, supra*, 222 Cal.App.4th at p. 943, quoting *People v. Buttram* (2003) 30 Cal.4th 773, 791

(*Buttram*) [conc. opn. of Baxter, J.].) We continue with the understanding that Appellant does not suggest that the Waiver was other than knowing, intelligent, and voluntary. (See *People v. Panizzon* (1996) 13 Cal.4th 68, 83-84 (*Panizzon*) [without more, the waiver of the right to appeal is knowing, intelligent, and voluntary where the record contains both a written waiver by defendant and the defendant's and attorney's statements to the court regarding the voluntary relinquishment of the right].)

We now must determine the effect, if any, of the certificate of probable cause on the Waiver. To this end, *Mashburn*, *supra*, 222 Cal.App.4th 937, is particularly instructive.

Like Appellant here, the defendant in *Mashburn* was charged with possession of methamphetamine and possession of a device for smoking a controlled substance. (*Mashburn*, *supra*, 222 Cal.App.4th at p. 940.) Like Appellant here, the defendant in *Mashburn* filed a motion to suppress the seized drugs and related evidence (§ 1538.5), which the trial court denied. (*Mashburn*, at p. 940.) Like Appellant here, the defendant in *Mashburn* agreed to change his plea.[16] (*Ibid*.) Like Appellant here, as part of his plea, the defendant in *Mashburn* gave up his right to appeal the denial of his section 1538.5 motion.[17] (*Mashburn*, at p. 940.) Finally, like Appellant here,

_____

[16] The defendant in *Mashburn* pled no contest. (*Mashburn*, *supra*, 222 Cal.App.4th at p. 940.) Although Appellant here pled guilty, for purposes of our consideration of the requirement of a certificate of probable cause, there is no difference. In both instances, a certificate of probable cause is not required to appeal the denial of a section 1538.5 suppression motion. (Rule 8.304(b)(4)(A); see § 1237.5.)

[17] Without limitation, the defendant in *Mashburn* gave up his "right of appeal." (*Mashburn*, *supra*, 222 Cal.App.4th at p. 940.) Although Appellant here only gave up his "right to appeal the . . . denial of [his section ]1538.5

34

the defendant in *Mashburn* filed a notice of appeal based on the denial of his motion to suppress. (*Id.* at p. 941.)

*Unlike* Appellant here, the defendant in *Mashburn* did not seek a certificate of probable cause, and the appellate court dismissed the appeal on this basis. (*Mashburn, supra,* 222 Cal.App.4th at p. 941.) As we explain, however, the reasoning in *Mashburn* is nonetheless applicable here. That is because, like Appellant here, the defendant in *Mashburn* failed to obtain a certificate of probable cause as a *"challenge to the validity of the waiver of the right to appeal in the plea bargain"*—regardless of the expressed intent to seek appellate review of the denial of a section 1538.5 suppression motion. (*Mashburn,* at p. 943, italics added.)

In *Mashburn*, despite the defendant's notice of appeal stating that the appeal was based on the denial of a section 1538.5 motion to suppress evidence, the court looked instead to what, in fact, the defendant would be challenging. (*Mashburn, supra,* 222 Cal.App.4th at p. 942.) Relying on Supreme Court guidance in *Panizzon, supra,* 13 Cal.4th 68,[18] and *Buttram,*

_____

motion," for purposes of our analysis, there is no difference. In both instances, the waiver covered appellate review of the denial of the section 1538.5 suppression motion.

[18]    In *Panizzon, supra,* 13 Cal.4th 68, the defendant agreed to a plea bargain that called for him to receive a specified sentence. (*Id.* at p. 73.) After the court sentenced the defendant to the negotiated term, he appealed—without obtaining a section 1237.5 certificate of probable cause—contending that the sentence violated the federal and state constitutional prohibitions against cruel and unusual punishment. (*Panizzon,* at p. 74.) The Supreme Court dismissed the appeal, concluding that the defendant was required to obtain a certificate in order to appeal. (*Id.* at pp. 89-90.) The court reasoned: Since the defendant was "in fact challenging the very sentence to which he agreed as part of the plea," the challenge "attacks an integral part of the plea [and] is, in substance, a challenge to the validity of

*supra*, 30 Cal.4th 773,[19] *Mashburn* explained:  In determining whether a

section 1237.5 certificate of probable cause is required, " ' "courts must look to

the substance of the appeal:  'the crucial issue is what the defendant is

challenging, not the time or manner in which the challenge is made.' " ' "

(*Mashburn*, at p. 942, quoting *Buttram*, at p. 781 & citing *Panizzon*, at p. 76.)

Under this standard, " ' "the critical inquiry is whether a challenge to the

[judgment] is in substance a challenge to the validity of the plea, thus

rendering the appeal subject to the [certificate] requirements of

---

the plea, which requires compliance with the probable cause certificate
requirements of section 1237.5." (*Panizzon,* at p. 73.)  Stated differently, "by
contesting the constitutionality of the very sentence he negotiated as part of
the plea bargain, [the] defendant is, in substance, attacking the validity of
the plea." (*Id*. at p. 78.)

[19]    In *Buttram*, *supra*, 30 Cal.4th 773, the defendant agreed to plead guilty
in return for an agreed maximum sentence—without a waiver of the right to
appeal the sentence.  (*Id*. at p. 776.)  The trial court imposed, and the
defendant then appealed from, the maximum sentence.  (*Ibid*.)  The Supreme
Court held that the defendant was not required to obtain a certificate of
probable cause because, "absent contrary provisions in the plea agreement
itself, a certificate of probable cause is not required to challenge the exercise
of individualized sentencing discretion within an agreed maximum sentence.
Such an agreement, by its nature, contemplates that the court will choose
from among a range of permissible sentences within the maximum, and that
abuses of this discretionary sentencing authority will be reviewable on
appeal, as they would otherwise be." (*Id*. at pp. 790-791.)
        In a concurring opinion, Justice Baxter (who authored *Buttram*) noted
that, by contrast, if the plea bargain had included an express waiver of the
right to appeal, the defendant would have been required to obtain a
certificate of probable cause *as to the validity of the waiver*.  (*Buttram*, *supra*,
30 Cal.4th at p. 793 [conc. opn. of Baxter, J.].)  That is because "an attempt to
appeal the sentence notwithstanding the waiver would necessarily be an
attack on an express term, and thus on the *validity,* of the plea." (*Ibid*.)

36

section 1237.5." ' " (*Mashburn*, at p. 942, quoting *Buttram*, at p. 781 & citing *Panizzon*, at p. 76; accord, *Stamps*, *supra*, 9 Cal.5th at p. 694.)

Applying this standard in *Mashburn*, the court dismissed the appeal for failure to have obtained a section 1237.5 certificate of probable cause, since "the substance of the appeal" was "a challenge to the validity of the waiver of the right to appeal in the plea bargain and, thus, the plea itself." (*Mashburn*, *supra*, 222 Cal.App.4th at p. 943.) That is because "[the defendant's] challenge to the denial of his motion to suppress may only be heard if the waiver of the right to appeal is unenforceable, which is an issue regarding which [the defendant] was obligated to obtain a certificate of probable cause." (*Ibid*.)

Likewise, here too, Appellant's challenge to the denial of his motion to suppress may only be heard if the Waiver is unenforceable—which, according to *Mashburn*, *supra*, 222 Cal.App.4th at page 943, "is an issue regarding which [Appellant] was obligated to obtain a certificate of probable cause." (Accord, *Buttram*, *supra*, 30 Cal.4th at p. 793 [conc. opn. of Baxter, J.], quoted at fn. 19, *ante*.) Accordingly, the lack of a certificate of probable cause *as to the enforceability of the Waiver* precludes appellate review of the issue of the denial of the section 1538.5 suppression motion.

Thus, under *Mashburn, supra*, 222 Cal.App.4th 937, Appellant's certificate of probable cause—based on the request that Appellant "would like to appeal . . . the 1538.5"—had no effect on the appeal. That is because *the substance of Appellant's appeal* is a challenge to the Waiver, which Appellant would have to overcome before he could obtain appellate review of the order denying his section 1538.5 suppression motion.

We are not persuaded by Appellant's attempt to distinguish *Mashburn*, *supra*, 222 Cal.App.4th 937.

First, Appellant argues that he only waived the right to appeal the denial of his section 1538.5 suppression motion, whereas the defendant's waiver in *Mashburn* was a waiver of all rights to appeal anything. (See *Mashburn*, *supra*, 222 Cal.App.4th at p. 940 [as part of his plea, defendant gave up his "right of appeal"].) However, as we explained at footnote 17, *ante*, for purposes of our analysis, there is no difference between the *Mashburn* defendant giving up his "right of appeal" and Appellant here giving up his "right to appeal the . . . denial of [his section ]1538.5 motion." In both appeals, the waiver applies to the right to appeal the denial of the section 1538.5 suppression motion.

Appellant next focuses on the differences between the pleas in the two cases. In *Mashburn*, the defendant's plea was what Appellant characterizes as "negotiated"—i.e., in exchange for the defendant's plea to one count, the prosecutor moved to dismiss (and the trial court dismissed) another count and a separate criminal case. (*Mashburn*, *supra*, 222 Cal.App.4th at p. 940.) By contrast, in the present case, Appellant pled guilty to all counts with no promises as to sentencing. According to Appellant, "[his] waiver of the right to appeal his motion to suppress was a unilateral step for which he received no benefit. But for that waiver, [he] would have been allowed to appeal the denial of that motion even without a certificate of probable cause."

We disagree with the premise of Appellant's argument. The Waiver was an agreement Appellant made as part of his plea agreement. Appellant's reliance on the facts that the prosecutor here was not involved in the negotiations and neither received nor gave up anything as part of the plea agreement is irrelevant. The hope of leniency in sentencing is well-recognized consideration for a defendant to plead guilty, as evidenced by almost a century of cases in which defendants have attempted (albeit

unsuccessfully) to withdraw guilty pleas when their hopes were not realized.[20]  (See, e.g., *People v. Manriquez* (1922) 188 Cal. 602, 605 [defendant entered his guilty plea "with the hope and expectation that the punishment to which he might be exposed would be mitigated"]; *People v. Taylor* (1963) 218 Cal.App.2d 321, 326 [defendant moved to vacate judgment and withdraw guilty plea on the basis of "the frustration of a defendant's hope for a lighter sentence"]; *People v. Martinez* (1957) 154 Cal.App.2d 233, 239 ["the appellant pleaded guilty in the hope of receiving milder punishment"]; *People v. Lamb* (1944) 64 Cal.App.2d 409, 410-411 [defendant moved to withdraw his guilty plea because the "court did not grant probation or impose a county jail sentence instead of a term in the state prison"].) Contrary to his suggestion on appeal, Appellant did participate in a plea *bargain*.

In sum, Appellant's request for and receipt of a certificate of probable cause *as to the section 1538.5 suppression motion* added nothing to the substantive issues that can be raised in this appeal.  At its best, the request was unnecessary, since a certificate of probable cause is not required to seek appellate review of the denial of a section 1538.5 motion.[21] (Rule 8.304(b)(4)(A); § 1538.5, subd. (m).)  However, the request could also be viewed as an attempt to obtain relief from the Waiver without disclosing this

---

[20]    Here, prior to his plea, Appellant was facing a third strike and a sentence of 25 years to life in prison.  In fact, the court exercised its discretion and imposed only one strike prior, sentencing Appellant to a total of eight years in prison.

[21]    Appellant agrees:  "But for that waiver, [Appellant] would have been allowed to appeal the denial of that motion even without a certificate of probable cause."

intent in the request to the trial court. Accordingly, without a certificate of probable cause *as to the Waiver*, we will not reach the merits of Appellant's arguments related to the denial of his section 1538.5 suppression motion.

C. *Appellant's* Pitchess *Motion*

Appellant asks this court to independently examine the sealed records of the police officer who arrested him on March 28, 2018, in order to determine whether the trial court abused its discretion in denying disclosure of the documents produced in camera. The Attorney General does not oppose this request.

1. *Background*

Appellant filed a *Pitchess* motion directed to six categories of documents related to the police officer who arrested him on March 28, 2018 (counts 3 & 4).[22]

At the hearing on the motion, the court and the parties all agreed that the records at issue were those which provided "information on the credibility, veracity, [and] integrity" of the arresting officer. After lengthy oral argument (and a concession by Appellant that one of the categories of requested documents was overbroad), the court ruled that Appellant had met his initial burden and agreed to review the records in camera.

_____

[22]    In his memorandum of points and authorities in support of the *Pitchess* motion, which was directed to evidence or complaints of dishonesty by the arresting officer, Appellant described these six categories of documents as follows:  "(1) false arrest; (2) false statements in reports; (3) false claims of probable cause; (4) false statements of education, training or experience in resumes, curriculum vitae, and employment applications; (5) false testimony; and; (6) any other evidence of or complaints of dishonesty[.]"  (Bolding omitted.)

The court then conducted an in camera review of the files produced by the custodian of records of the San Diego Police Department.[23] At the conclusion of the court's review of the files, the court stated that it had "reviewed in their entirety the contents of each of the file folders and documents handed to the court" by the custodian of records and concluded the in camera proceedings. Upon returning to the courtroom, the court ruled that, "Having conducted an in camera hearing, the court determines that no records of the nature sought are to be disclosed" and concluded the *Pitchess* motion proceedings.

2.     *Analysis*

In *Pitchess, supra,* 11 Cal.3d 531, our Supreme Court ruled that, upon a sufficient showing, a criminal defendant may obtain access to law enforcement personnel and complaint files. In the opinion, the court set forth several rules to guide practitioners and trial courts as to discovery of such files. (*Ibid*.) The court has described this procedure as "in essence a special instance of third party discovery." (*Alford v. Superior Court* (2003) 29 Cal.4th 1033, 1045.)

After *Pitchess,* the Legislature made personnel records of peace and custodial officers confidential, setting forth procedural conditions for obtaining discovery of these records or information from them. (See §§ 832.5,

_____

23     At the in camera proceedings, the trial court placed the police department's custodian of records under oath. The custodian testified that he conducted a search of all possible locations where records related to the arresting officer are located and that he brought to court all records responsive to the request. The custodian delivered to the court all of the records he brought, identifying each. On our own motion, we augmented the record on appeal to include (and seal) these records. (Cal. Rules of Court, rule 8.155(a)(1)(A); *People v. Rodriguez* (2011) 193 Cal.App.4th 360, 366 (*Rodriguez*).)

41

832.7, 832.8; Evid. Code, §§ 1043-1045;[24] *People v. Memro* (1985) 38 Cal.3d 658, 680 ["the principles of *Pitchess* were not only reaffirmed but expanded by the 1978 legislation," which amended § 832.5 and enacted §§ 832.7, 832.8 and Evid. Code, §§ 1043-1045 (see Stats. 1978, ch. 630, §§ 1-6)], overruled in part on a different issue in *People v. Gaines* (2009) 46 Cal.4th 172.) Appellant does not contend that the trial court failed to comply with its statutory duty to review the files produced by the San Diego Police Department.

On appeal, Appellant asks this court only to review the files produced by the custodian of records to determine whether the trial court abused its discretion by failing to turn over anything contained in the police department's files.

---

[24] A week prior to oral argument, Appellant brought to the court's attention Statutes 2021, chapter 402, sections 1-7, which concern the release of peace officers' records. As relevant to Appellant's presentation, the Legislative Counsel's Digest provides: "Existing law requires a court, in determining the relevance of evidence, to exclude from trial any information consisting of complaints concerning peace officer conduct that is more than 5 years older than the subject of the litigation. [¶] This bill would delete that provision." (Legis. Counsel's Dig., Sen. Bill No. 16 (2021-2022 Reg. Sess.).) This legislation amends Evidence Code section 1045, amends sections 832.5, 832.7, and 832.12, and adds a new section 832.13—*effective January 1, 2022*.

We decline Appellant's counsel's suggestion that we remand this case to the trial court with directions to conduct a new in camera review of all San Diego Police Department files that are responsive to Appellant's discovery request *under the new legislation*. Notably, at the time of the production of the police officer's records in this case, he had been with the San Diego Police Department less than five years. In any event, Appellant does not contend that this new legislation is to be applied retroactively, the legislation does not indicate it is to be applied retroactively, and we do not issue rulings based on legislation that will be effective after the date on which our opinion will become final in this court.

We have independently reviewed in camera the documents produced by the custodian of records of the San Diego Police Department and conclude that the trial court did not abuse its discretion in denying the requested discovery. (See *Rodriguez, supra*, 193 Cal.App.4th at p. 366 [after independent in camera review of the records, appellate court determines whether trial court "abuse[d] its discretion in denying discovery of the records"].)

D.      *Striking the Stayed One-Year Sentence Enhancement*

Appellant contends that the court erred, as a matter of law, in staying (rather than imposing or dismissing) the one-year enhancement based on a prison prior for purposes of count 3. Appellant relies on *People v. Langston* (2004) 33 Cal.4th 1237 (*Langston*), where our Supreme Court held: "Once the prior prison term is found true within the meaning of section 667.5[, subdivision ](b), the trial court may not stay the one-year enhancement, *which is mandatory unless stricken*." (*Langston,* at p. 1241, italics added.)

The Attorney General agrees, further relying on a January 1, 2020 amendment to section 667.5, subdivision (b), by which Appellant is no longer subject to the one-year sentence enhancement based on a prior prison term.

1.      *Background*

As part of his plea in May 2019, Appellant admitted the February 2006 prison prior alleged in the amended information. By this admission, Appellant was subject to a one-year enhancement for each of the felony convictions. (§ 667.5, subd. (b).)

At the sentencing hearing in March 2020, in its oral pronouncement, the court *struck* this enhancement as to count 1 and *stayed* it as to count 3. Inconsistently, the court's minute order reflects that the enhancements for

43

the prison prior under section 667.5 were "not imposed in the interest of justice." The March 2020 abstract of judgment does not refer to any section 667.5 enhancement.

2.    *Analysis*

As we explain, regardless of *Langston*, *supra*, 33 Cal.4th 1237, due to a change in the law, Appellant was not subject to the one-year sentence enhancement on count 3.

Senate Bill No. 136 (2019-2020 Reg. Sess.; Stats. 2019, ch. 590, § 1), effective January 1, 2020, amended former section 667.5, subdivision (b). "By this revision, the Legislature 'amend[ed] section 667.5, subdivision (b) to limit its prior prison term enhancement to only prior prison terms for sexually violent offenses, as defined in Welfare and Institutions Code section 6600, subdivision (b).' " (*People v. Sorden* (2021) 65 Cal.App.5th 582, 618, quoting *People v. Jennings* (2019) 42 Cal.App.5th 664, 681, and citing *People v. France* (2020) 58 Cal.App.5th 714, 718, 729 ["Senate Bill [No. ]136 eliminated an enhancement for defendants who served prior prison terms for non-sexually violent offenses"].)  " 'By eliminating section 667.5, subdivision (b) enhancements for all prior prison terms except those for sexually violent offenses, the Legislature clearly expressed its intent in Senate Bill No. 136 to reduce or mitigate the punishment for prior prison terms for offenses other than sexually violent offenses.' " (*Sorden*, at pp. 619-620.)

As alleged in the amended information, Appellant admitted that his prison prior was for the February 2006 conviction of section 314, subdivision (1).  Based on the elements of this crime, therefore, by his admission Appellant confessed that he "willfully and lewdly . . . [¶] . . . [e]xpose[d] his person, or the private parts thereof, in any public place, or in

44

any place where there [we]re present other persons to be offended or annoyed thereby." (§ 314, subd. (1).) However, this crime is not a sexually violent offense, as that phrase is defined in Welfare and Institutions Code section 6600, subdivision (b).[25]

The court sentenced Appellant on March 13, 2020—i.e., after the effective date of Senate Bill No. 136's amendment to section 667.5, subdivision (b). Thus, at the time of sentencing, Appellant was entitled to the ameliorative benefit of this amendment.[26]

With regard to the discrepancy between the oral pronouncement (enhancement stayed) and the judgment or abstract (enhancement not imposed), the oral pronouncement controls. (*People v. Leon* (2020) 8 Cal.5th 831, 855; *People v. Farell* (2002) 28 Cal.4th 381, 384, fn. 2.) The oral pronouncement, therefore, must be stricken, since it is erroneous as a matter of law. (§ 667.5, subd. (b).) Where, as here, the sentence is legally unauthorized, it may be corrected whenever the error comes to the attention of the reviewing court. (*People v. Dotson* (1997) 16 Cal.4th 547, 554, fn. 6.)

---

[25] Welfare and Institutions Code section 6600, subdivision (b) provides in full as follows: " 'Sexually violent offense' means the following acts when committed by force, violence, duress, menace, fear of immediate and unlawful bodily injury on the victim or another person, or threatening to retaliate in the future against the victim or any other person, and that are committed on, before, or after the effective date of this article and result in a conviction or a finding of not guilty by reason of insanity, as defined in subdivision (a): a felony violation of Section 261, 262, 264.1, 269, 286, 287, 288, 288.5, or 289 of, or former Section 288a of, the Penal Code, or any felony violation of Section 207, 209, or 220 of the Penal Code, committed with the intent to commit a violation of Section 261, 262, 264.1, 286, 287, 288, or 289 of, or former Section 288a of, the Penal Code."

[26] The Attorney General agrees.

45

For the foregoing reasons, we will strike the court's oral pronouncement *staying* the section 667.5, subdivision (b) one-year enhancement on count 3.[27] Since the judgment and abstract of judgment do not contain this stay of the enhancement, neither has to be vacated, corrected, or amended.

## IV. DISPOSITION

The trial court's March 13, 2020 oral pronouncement staying the section 667.5, subdivision (b) one-year enhancement on count 3 is stricken. The judgment is affirmed.

IRION, J.

WE CONCUR:

HUFFMAN, Acting P. J.

O'ROURKE, J.

---

[27] This oral pronouncement is found in the reporter's transcript.